

SOUTHERN DISTRICT OF MISSISSIPPI
FILED
JUL 12 2017
ARTHUR JOHNSTON
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 2:17cr13-KS-MTP

JASON MAY  18 USC § 371

**The United States Attorney charges:**

At all times relevant to this Information:

### GENERAL ALLEGATIONS

1. Advantage Pharmacy, LLC, d/b/a Advantage Medical and Pharmacy ("Advantage Pharmacy") was formed in 2008 and located in Lamar County, Mississippi and was initially an open door, retail pharmacy. In or around 2012, Advantage Pharmacy entered into a contract with a local marketing company ("Marketing Company 1") and shifted its primary business focus to the production of compounded medication.

2. When created properly, compounded medications were drugs combined, mixed, or altered by licensed pharmacists or other practitioners to meet the needs of individual patients.

3. Defendant **JASON MAY ("MAY")**, of Lamar County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi.

4. **MAY** was the Pharmacist-in-Charge ("PIC") of Advantage Pharmacy, as well as a co-owner. As the PIC, **MAY** was responsible for supervision, management, and compliance with all federal and state pharmacy laws and regulations pertaining to Advantage Pharmacy's pharmacy practice.

5. TRICARE, administered by the United States Department of Defense, provided health care benefits for United States military personnel and their families. TRICARE, like other health

care benefit programs, was a health care benefit program within the meaning of Title 18, United States Code, Section 24(b).

6. Individuals who qualified for TRICARE benefits or the benefits of other health care benefit programs were commonly referred to as "beneficiaries."

7. TRICARE and other health care benefit programs provided prescription drug coverage, including prescriptions for compounded medications, to eligible beneficiaries through its pharmacy program or similar drug plans.

8. TRICARE's pharmacy program and other health care benefit programs' drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibility was to adjudicate and process payment for prescription drug claims submitted by eligible pharmacies. Specifically, TRICARE's PBM was known as Express Scripts.

9. Epic Pharmacy Network ("Epic") provided centralized contracting and administrative services for more than 1,900 independent pharmacies, including Advantage Pharmacy. Advantage Pharmacy entered into a Services Agreement with Epic, authorizing Epic to contract with PBMs on behalf of Advantage Pharmacy, and in so doing, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws. On behalf of Advantage Pharmacy, Epic entered into contracts with PBMs, including Express Scripts.

10. Advantage Pharmacy also contracted directly with PBMs, including Express Scripts. In contracting with PBMs, including Express Scripts, Advantage Pharmacy agreed to adhere to the rules and regulations of the PBMs, which reserved the authority to refuse to reimburse any and all claims not submitted in accordance with its rules and regulations. PBMs also audited participating pharmacies to ensure compliance with its rules and regulations.

11. Most, if not all, PBMs, including Express Scripts, required participating pharmacies to

collect copayments from beneficiaries, and specified that copayments could not be waived or reduced. Consistent copayment collection was necessary to prevent fraud, as copayments gave beneficiaries financial incentives to reject medications that were not medically necessary or had little to no value to beneficiaries' treatments. PBMs, including Express Scripts, relied upon participating pharmacies to collect copayments.

12. Advantage Pharmacy, through its contracts with Epic and PBMs, including Express Scripts, represented that it would collect copayments, and not waive or reduce them. These representations by Advantage Pharmacy were material to the PBMs, including Express Scripts.

13. Co-conspirator 1, identified as Advantage Pharmacy's "manager" and "member," co-owned Advantage Pharmacy together with **MAY** and others. Co-conspirator 1, on behalf of Advantage Pharmacy, contracted with Epic and Express Scripts, as well as with other health care benefit programs and PBMs, and further obligated Advantage Pharmacy to follow the rules and regulations of Epic, Express Scripts, TRICARE, as well as the other health care benefit programs and PBMs.

14. In order to be reimbursed for prescription drugs provided to beneficiaries, pharmacies, including Advantage Pharmacy, were required to first obtain prescriptions authorized by physicians or other qualified medical providers ("prescribers"). These prescriptions were supposed to evidence that the prescribed drugs, including compounded medications, were medically necessary. TRICARE and other health care benefit programs, through their respective PBMs, would not reimburse claims for prescription drugs, including compounded medications, that were not medically necessary.

15. Upon receiving prescriptions, pharmacies, including Advantage Pharmacy, submitted claims for prescription drugs to health care benefit programs or PBMs, such as Express Scripts.

Health care benefit programs or PBMs, including Express Scripts, reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

16. TRICARE and other health care benefit programs, through its PBMs, reimbursed pharmacies, including Advantage Pharmacy, for compounded medications per ingredient compounded into the medication. Thus, the more ingredients compounded into medications, the higher the reimbursement amounts.

17. Citizens Bank was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Citizens Bank was headquartered in Columbia, Mississippi, and maintained branch locations throughout the Southern District of Mississippi, including Lamar County, Mississippi. Between approximately May 2008 and April 2016, Advantage Pharmacy held accounts at Citizens Bank, including but not limited to account No. x3786 ("Business Account").

18. Trustmark Corp., ("Trustmark") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Trustmark was headquartered in Jackson, Mississippi, and maintained branch locations throughout the Southern District of Mississippi, including Lamar and Forrest Counties, Mississippi. Between March 7, 2014 and continuing until at least February, 2015, **MAY** opened and maintained a money market account at Trustmark bearing account No. x5024 ("Money Market Account").

19. Bancorp South, Inc. ("Bancorp South") was a financial institution within the meaning of Title 18, United States Code, Section 20, the deposits of which were insured by the Federal Deposit Insurance Corporation. Bancorp South was headquartered in Tupelo, Mississippi, and maintained branch locations throughout the Southern District of Mississippi, including Lamar and

4

Forrest Counties, Mississippi. Between March 18, 2014 and continuing through at least February, 2016, **MAY** opened and maintained an account at Bancorp South bearing account No. x4011 ("Bancorp South Account #1").

## COUNT 1

20. The allegations at paragraphs one through nineteen of this Information are re-alleged and incorporated by reference as though fully set forth herein.

21. Beginning in or around January 2012, and continuing through in or around December 2015, in Lamar County, in the Eastern Division of the Southern District of Mississippi and elsewhere, the defendant, **JASON MAY**, did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Co-conspirator 1, and other persons known and unknown to the United States Attorney, to commit offenses against the United States, that is:

(a) to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, TRICARE and other health care benefit programs, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

(b) to knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting commerce, in criminally derived property of a value greater than $10,000, and derived from specified unlawful activity, that is, health care fraud (a violation of Title 18, United States Code, Section 1347), in violation of Title 18, United States Code, Section

1957.

## PURPOSE OF THE CONSPIRACY

22. It was a purpose of the conspiracy for **MAY**, Co-conspirator 1, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to TRICARE and other health care benefit programs; (b) concealing the submission of false and fraudulent claims to TRICARE and other health care benefit programs; (c) diverting proceeds of the fraud for personal use and benefit; and (d) depositing, withdrawing, and transferring the proceeds of the fraud into and between bank accounts for personal use and benefit.

## MANNER AND MEANS

23. The manner and means by which **MAY**, Co-conspirator 1, and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

24. **MAY**, Co-conspirator 1, and other co-conspirators, acting on behalf of Advantage Pharmacy, selected formulas for compounded medications, not based on scientific evaluations of effectiveness or individualized patient need but rather, to maximize reimbursement from TRICARE and other health care benefit programs ("High-Yield Compounded Medications").

25. **MAY**, Co-conspirator 1, and other co-conspirators, acting on behalf of Advantage Pharmacy, mass produced these High-Yield Compounded Medications and further collaborated with Marketing Company 1 to create a series of preprinted prescription forms encouraging and directing prescribers to prescribe these High-Yield Compounded Medications.

26. As reimbursement opportunities changed for certain ingredients compounded into these High-Yield Compounded Medications, **MAY**, Co-conspirator 1, and other co-conspirators either added ingredients to or deleted ingredients from these High-Yield Compounded Medications for the purpose of maximizing profit, not patient care, and accordingly, revised the preprinted

prescription forms.

27. Advantage Pharmacy contracted with marketers associated with Marketing Company 1 to solicit prescribers to prescribe High-Yield Compounded Medications, and further paid kickbacks to marketers when they obtained signed prescriptions that were reimbursed by TRICARE and other health care benefit programs.

28. These marketers routinely induced prescribers to prescribe these High-Yield Compounded Medications by not only providing the preprinted prescription forms but also by paying kickbacks to the prescribers, after the High-Yield Compounded Medications had been dispensed by **MAY** and others at Advantage Pharmacy and reimbursed by TRICARE and other health care benefit programs.

29. These marketers routinely induced beneficiaries of TRICARE and other health care benefit programs to receive High-Yield Compounded Medications by paying kickbacks to these beneficiaries.

30. To further induce beneficiaries to receive these High-Yield Compounded Medications, **MAY**, Co-conspirator 1, and other co-conspirators, conspired to either waive copayments or pay copayments on behalf of beneficiaries, even though TRICARE and other health care benefit programs required copayments to be paid by beneficiaries and collected by Advantage Pharmacy.

31. Between approximately January 2012 and approximately December 2015, **MAY** dispensed prescriptions for High-Yield Compounded Medications to beneficiaries of TRICARE and other health care benefit programs that were not medically necessary, induced by kickback payments, and where copayments were either waived or paid by Advantage Pharmacy, and accordingly, submitted or caused to be submitted false and fraudulent claims for reimbursement to health care benefit programs and PBMs, including Express Scripts.

32. TRICARE and other health care benefit programs, as well as PBMs, including Express Scripts, relied upon **MAY's**, Co-conspirator 1's, and other co-conspirators' false and fraudulent representations (a) that the medications dispensed were medically necessary and not induced by kickback payments; and (b) that copayments were properly collected.

33. In reliance on those and other false representations, TRICARE and other health care benefit programs reimbursed Advantage Pharmacy approximately $192 million for High-Yield Compounded Medications.

34. **MAY**, as a co-owner of Advantage Pharmacy, received a percentage of Advantage Pharmacy's profits, including a percentage of the reimbursements paid by TRICARE and other health care benefit programs, which were proceeds of the fraud.

35. To transmit profits to **MAY,** Co-conspirator 1 signed checks drawn on the Business Account made payable to **MAY**, who, in turn, deposited the fraudulently obtained proceeds into Bancorp South Account #1. Thereafter, **MAY** withdrew the fraudulent proceeds from BancorpSouth Account #1 and deposited the same into the Money Market Accounts.

## OVERT ACTS

36. On or about January 8, 2015, **MAY** dispensed a prescription for a High-Yield Compounded Medication to J.M., a TRICARE beneficiary, which was not medically necessary.

37. On or about February 17, 2014, **MAY** dispensed a prescription for a High-Yield Compounded Medication to M.M., a TRICARE beneficiary, for which Advantage Pharmacy neither collected a copayment nor made any efforts to do so, despite representations to the contrary.

38. On or about April 4, 2014, **MAY** knowingly engaged in a monetary transaction with the proceeds of health care fraud in an amount greater than $10,000, to wit: **MAY** withdrew $400,000 in fraudulently obtained proceeds from Bancorp South Account and, that same day, deposited

$200,000 into the Money Market Account.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

1. The allegations contained in Count One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c).

2. Pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), upon conviction of a conspiracy to violate sections 1347 and 1957, in violation of Title 18, United States Code, Section 371, the defendant, **MAY**, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

   a. Funds in the amount of $361,373.81 seized from Bancorp South account number 75282178 (Bancorp South Account #1), an account held in the name of JCM, LLC, authorized signers Jason May and Kelsey May.

   b. Funds in the amount of $35,477.06 seized from Bancorp South account number 75904011, an account held in the name of Jason or Kelsey May authorized signers Jason May and Kelsey May.

3. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

9

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c).

_____
HAROLD BRITTAIN
ACTING UNITED STATES ATTORNEY